Counsel? Morning, Judge. I understand you've settled one of these cases. Yes, sir. We would be commended for that. Both sides are. Thank you. Couldn't settle this one, huh? No, sir. Never say never. Never say never. I haven't settled it yet, Your Honor. May it please the Court, I'm John Komeiji, Counsel for Appellant. Basically, the issue, as you all understand, is whether or not qualified immunity should be extended to the police chief. In an instance where his personal confidential secretary is making statements that are, one, in our view, not of public concern. And two, creates a situation where you have a distrustful and disruptive relationship between the police chief and his personal private secretary. One of the points I want to... Between the police chief and just about everybody in the Kauai Department. No, probably 50-50, Your Honor. And it doesn't matter, you're not from here, but the current police chief has the same situation. So it's not particularized to any particular... I know enough about Kauai to know it's a small town. It's a very small town, Your Honor. But the point I wanted to make, though, to make clear, is that this is not a whistleblower case. This is not a whistleblower case. In fact, the whistleblower case was filed in state court in this particular matter and was dismissed. What about the letter to the editor? I grant you, Your Honor... In the magazine. The way I looked at it, there's three instances, and I'll get to the letter. The letter is, in my opinion, something that you could characterize as being something of public concern. I think... In part, she defends the department, right? Yes, in large part. And she doesn't really... Was not really derogatory. The problem is that you have an employee who is in this position of trust and confidence who is making unauthorized statements to the media. And jeopardizing that relationship between someone who is allowed to look at... Or not allowed, but by nature of her job is subject to seeing confidential information. And she's making unauthorized media statements. Not just a statement to another employee. Not a statement to someone else, but actually to the media. What if she was a whistleblower? What if instead of saying, really, we're... Don't believe everything you read. This is actually a pretty nice department, which is kind of what she says. What if instead she said, I'm writing to the Honolulu magazine because I want to expose the biggest fraud ring in Hawaii that's going on right under my nose in my department. Would that be a whistleblower case? I think that would be. And that would be legitimate for her to write, even though she was kind of speaking out of turn? I think... And I can't tell you the exact case, but I think if we look at the content, content of what's being said, we have to use that in the Pickering balancing test. And I think in the instance that you... The hypothetical that you give me, I think the balance would probably weigh in favor of the employee being able to make the statement. As opposed to the disruption to the employment relationship. Here is at your position that the Honolulu advertising... The Honolulu... Magazine. Magazine. Thank you. Squibb, which isn't all that long, actually. Yes. Tiny paragraphs. That that's actually a matter of public concern, but when you weigh it under Pickering, that she would lose, in your view, under that second prong. Yes. Yes, Your Honor. And I think that that's the way I look at it. That the second prong, that having your own personal secretary who, again, I don't want to repeat myself, but is someone that you need to develop a trusting relationship with, is then making unauthorized media statements. At the time that she sends the letter, he's on leave. Yes. And at least according to her brief, is that she said that she'd been given permission to send the letter. Not from him, Your Honor. Well, but he wasn't there at the time. She wasn't reporting to him because he was on leave. And so I'm not sure... You said a number of times, unauthorized, but she had reason to think it was authorized. If this case was only about the letter, it would be a very hard case for termination to say that you weren't authorized by me to write a letter at a time when I was on leave, so not here to authorize it. Somebody else did. Emphasizing the unauthorized part, I think, gives a funny spin on a case, particularly at a summary judgment stage when we have to accept the inferences to be drawn by. Maybe the emphasis is undue on the unauthorized, but I think the emphasis should be placed on the fact that when you do the balancing test, the fact that you have, at least in the chief's view, some media statements being made by his personal secretary, that the balance at that point in terms of the relationship, the distrust and the damage to the relationship is there from his standpoint. It's not the letter by itself. Right. And so I'm being unfair and saying if it were just the letter by itself, because it's hard to get an impression of distrust purely from that, that's one of several. Yes. I appreciate that. But I think the letter, the unauthorized part, I think, may be, for summary judgment purposes at least, hard to sustain. I was going to say, I've never heard a judge say that he's been unfair. But other judges are unfair all the time. Yes, yes. I guess in terms of the other two statements, the first statement dealing with whether or not the chief was living with his then girlfriend, now wife, there's nothing illegal about it. I don't see, and we dispute the trial court's determination that somehow that statement becomes one of public concern. So we don't even think you get to the first level as to whether or not that is a protected speech. Same thing, the memorandum of August 27th is, in my estimation, also not one of public concern. Because we have to look at the cases as we look at the context and content of what's being said. The context of what's being said is that you have a letter from the chief questioning what his assistant is doing, his secretary is doing. She is not whistleblowing. She is responding in an internal sort of investigation between the police commission and the mayor. She writes a letter to the mayor and the police commission about what she did. She is not the one going and saying that somehow the chief did not comply with the directive of the police commission to turn in her gun. She, if you look at the letter carefully, is defending her actions. As the cases point out, one of the distinctions we look at in terms of whether or not something is or is not a public concern is whether or not that person is speaking as a citizen or as an employee. I would suggest to you that in this context, that the appellee was speaking as an employee and justifying her actions to the police commission, what she did. The interesting thing about that letter, to sort of jump ahead, is that that letter demonstrates to me, without question, the irreparable nature of this relationship and goes back to the balancing test. Let me ask if we're really focusing on three pieces of potential First Amendment evidence. And just hypothetically, if I agreed with you on the girlfriend statement and the internal memo, and if all you were left with is the Honolulu Magazine article, squib, how would you analyze this case? In other words, you would have, let's say, I said, just hypothetically, that's protected under the First Amendment, Pickering would let her send it off, and she did. Would there still be a factual issue as to whether that letter was a substantial reason for her termination? And would we still? I'm going to try and answer. I'm not sure if I understand your question, but I'm going to try and answer it the best I can. You only have the only piece of evidence that you're dealing with is the Honolulu Magazine. I don't think that gets us to the second half of the Pickering balance. That's the part I don't quite understand. In the sense that if the allegation was that letter, or that letter to squib, was in the Honolulu Magazine, and we had as evidence that the relationship was disrupted or dysfunctional, whatever you want to call it, based on, for example, the internal memo, I still say that I think that it would weigh, we're not looking at the memo as to whether it was protected speech, but using that as evidence as to whether or not there was an irreparable type of damage. The problem is that she doesn't go after him in the Honolulu Magazine. It's not like she's defending that apartment, so I'm having trouble understanding why you would tie up. I'm using evidence for something else. I'm using the memo as evidence. The Pickering test requires us to look at whether or not there's been some disruption to the employment relationship. And what I'm saying is that if we look at that letter, not as a, I'm sorry, internal memo, not as a piece as to whether or not it's protected speech, but as evidence of the disruptive relationship, that I would say that still the balance is in favor of the employer or the felon. So let's say you lose on the balance issue. Then where do you go? On the Honolulu Magazine. Well, then the issue becomes whether or not there is a clearly understood violation of a right. And I think the Moran case is a case that we would rely on in terms of what, the violation is not the violation of someone's First Amendment rights. The violation is how the Pickering balance comes out, which is sort of an interesting, I mean, it's not as clear cut to me as it might be to other people, but I think Moran makes the point that in almost every case when you have to balance, it's not as clear, it's not as clear cut as one would have it. The Supreme Court took our Ceballos case and recently heard an argument. They generally don't take Ninth Circuit cases to affirm. I had one affirmed last year, so I have the other. I'm going to stop. That's a good joke, but the truth is that our affirmance rate is on track with the other circuits. In case anyone in the media is here. But we like to make a joke on ourselves anyway. Yes, sir. Should we wait for Ceballos? I don't think, well, I don't believe so. It might help him. Yes, it might. What I'm saying is that I think that the case law is pretty good. Chief Justice seemed to suggest during the argument that what an employee says during the employment relationship can never qualify. Well, in that case, Your Honor, not having heard the argument, if that, in fact, is the position of court, it would help us immensely. I think that the case law is pretty well set forward right now. I really do. There's not much dispute about the law as between Apelli and Apellon, and it's more whether or not it's protected speech and whether or not how the balance comes out. So if there's an absolute rule, of course, it would help us that whatever an employee said is not protected. Well, I don't want to predict what this means. We'll just have to see. You've got about three minutes. Okay. Maybe if I could state that for rebuttal. Thank you. Counsel? Court, I'm Clayton Kaye. I represent the appellee in this case, Ms. Tokushige. I think there are a couple of points that need to be cleared up initially, and that is that Ms. Tokushige was not only the secretary of the police chief, but at the same time, unknown to him, she was the secretary of the police commission. And that is a point that Judge Kaye in his ruling talked about, that she had, in fact, due capacity. She was the secretary to the chief, and while he was on suspension with leave, she was secretary to the acting chief, to whom she made reports of Freitas' misconduct, which is the misconduct, part of which is the August 27th letter. That's sort of a doomed job description, isn't it? That is correct. And that is a point that Judge Kaye emphasized in his ruling, that when there came a conflict between the police commission, or when there was created a conflict between the police chief when he chose not to follow the directive of the police commission, namely to surrender his badge, gun, and identification, when he challenged their authority, and when he, despite their admonition, do not approach any police officers, stay away from the police station, then there became a conflict not only between Chief Freitas, who was on suspension under clear orders from the police commission not to do the things he did, but also, and he continued to do them, it placed my client in an untenable position in that she has to... Is that so? I mean, is that so? Did her description as secretary to the police commission include responsibilities as an investigator? No, she's not an investigator. She didn't do that. A law enforcement officer. Was she charged with any responsibility to enforce the orders of the commission? She was charged with... She was not charged to enforce the responsibility of the commission. She was charged with reporting. But she did more than report. She wrote the letter. No, she did more than report. She, a non-authorized officer in terms of law enforcement, basically takes his gun, right, out of his drawer. That's not reporting to someone to say, you know what, the chief's gun's still in his drawer. You know this. I would direct the court's attention to page one of our appendix because therein contains the page one to page three of the appendix because in that memo, which is dated August 27th, to police commission chair Wilhelm, the other members of the police commission, the mayor, as well as the county attorney. She states why she took the gun. That was a loaded weapon in an unlocked drawer. Right, and she's a secretary. That's right, and she points out... Who works in a law enforcement situation. That is correct. Who doesn't call in any law enforcement officer to say, we've got an unlocked drawer with a gun in it. No, I believe that's covered in her memo, where she did make contact with a officer and he did do a check, and that gun was found to be loaded, it was unloaded, and it was put in a safe in the chief's office. You have some difficulty admitting, and I guess it's understandable given who your client is and what the facts of this case are, but won't you concede that there's a difference between seeing the gun in the drawer, closing the drawer, and finding a law enforcement officer or pointing it out to the commission? She's in the same building with lots of police officers, isn't she? She's in the same building. They're what, 10, 15 feet away? And during the time that she put the weapon in the... But why do you have so much difficulty understanding the difference between observing, reporting, and taking action? I don't see, I don't have difficulty in Ms. Togashige doing what is necessary to protect herself, as well as other members within her immediate work facility, which included other secretaries, by having a police officer remove that weapon from an unlocked drawer. She removed it. She identified the weapon. She removed it. Just reading her letter, it says, I explained the situation to a police sergeant, and he felt the gun should be secured. After I retrieved the gun, the sergeant disengaged the gun. And it seems peculiar to us that she wasn't the sergeant. Go get the gun. That's apparently not what happened. So, if the court is saying, let's make a distinction between seeing the weapon and removing it, as opposed to having another officer remove it, then I guess the court is... There are really important technical rules that govern the operation of those officers, civilian officers, who have the authority to have weapons and to use them. Yes. And just as it was inappropriate for the chief not to have obeyed the order of the commission, it was equally inappropriate for her to take the action that she did, which went way beyond simply reporting. I don't agree with Your Honor on that point. But if I can move on to the letter. If that was all this case was about, what she did with respect to that weapon, would we have a First Amendment issue? Yes, Your Honor. How? Because she reported in that same letter. No, no, no, no. If the police chief, when he was reinstated to duty, had come back and said, you're terminated, and I want to tell you why. It was for removing that loaded weapon and putting it in a safe. It has nothing to do with anything you said to the police commission. That act was outside your authority as a secretary. You're terminated. That's not... Would we have the same issue? I don't believe that. Under that, there might be a different holding. But that letter also conveyed to these officials of the quiet county acts that Mr. Freitas did, and that is he created the situation by coming back to the police station, having contact with the police department employees. What's by the commission's directive? What's the First Amendment? Basically, you've got a challenge to his command and his authority, and she may be absolutely correct. But since she's also secretary of the commission, simply going back and forth between the commission and the police officer, I'm kind of hard-pressed to know what the First Amendment right is. They already knew that he hadn't turned in his gun. The First Amendment right is triggered in this case of the letter. The county council had received two letters from the chief complaining about the acts of his secretary, the acts of the commission secretary, and asked for a response. She wrote that letter in response at the request of the county attorney, detailing what she did with respect to this weapon, detailing why she did it to protect herself, to protect other people within her immediate work area, because this was a loaded weapon in an unlocked drawer. She just secured it and put it in a locked safe within the same office. In terms of the letter, I would direct your attention to page four, which is the full-blown article in the Honolulu Magazine, which basically headlines Kauai chief besieged, and basically attacks the department, the mayor, and the police commission for apparently misgivings that Chief Freitas had in the way they were conducting the investigation. This was the precipitating article, as Judge Kaye pointed out. Her response was not attacking, was not derogatory at all to Chief Freitas. He was defending the mayor, the police commission, and the department. But that really distinguishes this Honolulu Magazine article. I mean, it's just basically her defending her department in public, which is a fair thing to do. That is correct. Nevertheless, Chief Freitas acknowledged that he took offense by that. And he acknowledged that on page 83 of the appendix, although it was not an attack on me, I thought it was inappropriate for my private secretary to be feeling the need to be writing that. I just didn't think it was the right thing to do. But the problem that he had is, before that letter went out, Ms. Togeshi gave security approval, and go ahead, from the mayor of the county, from the county attorney, and from the police commission. They basically wanted her to write that letter. What is your understanding of the law where an employer terminates an employee and has several reasons for doing it, one of which, under scrutiny, is entirely legitimate and independent of any exercise of First Amendment rights by the employee, and others that may be more questionable? I think it's clear that if you just rely upon that acknowledged reason, and if it is admitted by the employer, then the employee would be entitled to a directed verdict on the issue of First Amendment violation. In fact, that was the case with respect to Chief Freitas when he was asked the question at his deposition as to why he terminated Ms. Togeshi. He brought up the thing about, well, she mentioned to me this year, and I'll refer you to page 77, on the appendix. I remember Jackie admonished me in 2001 that the community supported me because there was a sense that I had a tough time with my ex-wife. But if I brought this young lady back, I would lose their support and the commission's support. Jackie went so far as telling me that if I insisted on bringing this lady over, I should put her in a hotel in Honolulu. That is one of the reasons why he stated that he terminated my client. Well, I think that more, let me just ask the same question a different way. Let's assume that is not a First Amendment violation. Let's assume there's like five reasons he terminated her, one of which might have been a First Amendment violation. Isn't the standard, if he can show he would have terminated her anyway, that he would win? But if he can't meet that burden, then she would win? And that would get into the balancing tests articulated by the Pickrey case and adopted by the Moran case in this circuit and the Kaiser case in this circuit. Well, let me ask you a question. If out of all these pieces of evidence, and a bunch of them fell out, so we now have only three, but if out of the three remaining pieces of evidence, we were, just for purposes of talking here, to determine that two of them really didn't meet this balancing test and First Amendment, and you only had one of those pieces left, would you still have factual issues such that the case would go to trial? Yes, I believe so. Because then you would be required to adopt the balancing test or apply the balancing test. And I would point your honors to the balancing test, a question of law. Yes, a question of law with facts applied to it. And on this, it is clear that Chief Freitas offered no evidence that there was any disruption at the workplace. In fact, he offered evidence to the contrary. He removed my client on the first day of his return. He fired her within three months of his return. On page 85 of the appendix, he is asked about any potential disruption. The question is asked, did you inquire as to Jackie's work performance from the time that you had transferred her until you gave her her letter of termination? His response is, I can't remember the time, but I think he told me, referring to Deputy Chief Ihu, I think he told me that she had been helpful. Further on, he's asked on page 86 of the same appendix, which is his deposition transcript, did you receive any negative performance evaluations from either Miles Tanabe or Casey Lum, in whose office she had been transferred, about Jackie's performance after you transferred her from your office? His response was, nothing negative. The only thing that I remember was that she was healthy with the upcoming conference that had been one of the early tasks to assist in the upcoming conferences. So the Chief himself acknowledges that there was no workplace disruption. And the Kaiser and the Moran place thoroughly hold that there has to be more than a mere suspicion of disruption, there has to be proof of actual disruption. Well, that's no disruption in her role in the transferred position. Was her job position specifically linked to being the private secretary to the Chief, the Deputy Chief in commission? Yes. Did she have a separate civil service or equivalent job so that she could seek permanent employment in whatever department she was transferred to? Let me ask you this answer question, several answers. She was not civil service. She was an appointed position. Her appointed position was that she was to serve as the secretary to the Chief, the Deputy Chief, and to the police commission. In her role as the police commission secretary, she was to process all claims and basically do the administrative work as directed to or by the police commission. Well, it seems to be something else then to say that there's no disruption. She did a temporary position in the administrative unit. There's no disruption to the workplace there. But if and when she is restored to her official position as private secretary to the police chief, deputy in commission, what happened when she was in the administrative unit doesn't speak to what the relationship would be if and when she went back to her original position. Well, then we're left to speculate, and that's the problem we have. Chief Freitas removed her on the first day, so he had no evidence. And indeed, when he was asked, all he could justify the reason was the Honolulu magazine that was on his desk at the time of removal. But there is no evidence of any disruption. Okay. Thank you for your argument. Roberto? Just two brief points to answer some of the questions. I think the question was, if there are three grounds, two of them, which are not sustainable, but there's an independent ground to terminate, what is the case law? And I looked through a brief. I don't think we have any. The only analogy I can think of is when a district court judge makes a ruling on three different grounds. I just don't know. I think the law is this, but you can check it. I think the law is you first have to prove it's a substantial or motivating factor. Right. But once that's done, the employer then, the burden shifts back to the employer. Right. I think that's in the Moran. To be able to show that it would have been done in any event. So I think that's the burden shift. So I think that's the Moran. It may be in the Moran case, but I just couldn't remember. The other question that seems to be coming up is the damage to the relationship. And I think the damage to the relationship, the court should focus on the relationship between the chief and his secretary, not the secretary and the rest of the department or in her temporary position. And I think the strongest words to that, or the strongest evidence to that, is both the chief's testimony that's in the record that he lacked trust of her and that the trust relationship had eroded. And secondly, that August 27th letter. Thank you. Let me ask you, but let's not think in reverse. She did spend something like three months in a different position. Yes, sir. I take it that was purely a temporary assignment. Yes. It's not a long-term assignment. So she had no claim to that position. Her only job relationship was the chief. She has an at-will appointed position. The description, I don't know if I quoted, I was at 43P in the record in terms of her job description, but it's an at-will position because it's such a high position. At-will, but she can't be fired for exercising her First Amendment rights. Correct. Assuming you overcome all the pickering issues and all of that, I agree with that. Okay. Thank you. Thank both sides for their arguments. The case, it's argued, will be submitted and the court will stand adjourned.
judges: Hawkins, McKeown, Clifton